[Civ. No. 7150.  Third Dist.  Aug. 18, 1945.]

KATHLEEN B. CORY, Appellant, v. MELVIN H. CORY, Respondent.

Clarence E. Rust for Appellant.

A. L. Wirin and Wayne N. Collins as Amici Curiae on behalf of Appellant.

Lawrence J. Skirving for Respondent.

ADAMS, P. J.—On April 13, 1943, in an action for divorce brought by Kathleen B. Cory against Melvin H. Cory, an interlocutory decree of divorce was granted to plaintiff on the grounds of defendant's extreme cruelty, defendant having been served with summons and failed to appear. The custody of two minor children of the parties, a boy aged about 5 years and a girl aged about 2½ years, was awarded to plaintiff.

. On or about April 24, 1944, Melvin H. Cory filed a notice of motion to modify the aforementioned interlocutory decree, and in support thereof filed an affidavit in which he averred that the place where the children were living was an unfit and improper place, that plaintiff was a member of the Jehovah Witness sect and was teaching the children to disrespect the United States of America and the flag of the United States; that he once found plaintiff's home crowded with preachers of the aforesaid sect and there was not sufficient room for the children; that he (defendant) had a good place to keep said children where they would be taught to respect the United States and its flag, and that it would be to the best interest of said children that their custody be awarded to him.

Plaintiff countered with an affidavit alleging that the home where the children were living with her was a fit and proper place, and she a fit and proper person to have their custody, and that it was for their best interest that they remain with her. She admitted that she was a member of Jehovah's Witnesses, but otherwise denied the allegations of defendant's affidavit. A hearing was had on May 23 and 24, 1944, at the conclusion of which the court filed findings of fact and conclusions of law in which it was found as follows:

"3. That the plaintiff has been teaching the said minor children to refuse to give allegiance to the flag of the United States and to the United States, and to refuse to defend the flag and to refuse to defend the United States against its enemies when at war; said plaintiff believes, and has also taught and will continue to teach the said children of the parties hereto to defend in times of peril only persons who believe as she does, and to this end to sacrifice their lives, if need be, but not to raise a hand in defense of their country, or the flag it represents, even in times of war when the existence of our nation is threatened. On the other hand the father objects to such teaching being imbued in their immature minds, and desires that said children be reared as loyal Americans to respect and salute the flag of their country and to defend it when called upon to do so by the Government thereof;

"That while the mother of said children is a moral person, the teachings which she is trying to impress upon the said minors will not be for their best interest or for their welfare. That the teachings of the father will be for their best interests and for the welfare of said children;

"That the teachings of the said plaintiff so far as the minor son is concerned has already so imbued him with disrespect for the flag and unpatriotic thoughts that when the flag is displayed he becomes ill at ease and greatly agitated;

"That the said teaching of plaintiff will not only prevent the said minors from becoming loyal American citizens, but will prevent them, should they later in life desire to join, from joining any of our leading character building groups and organizations, as well as all the leading fraternal organizations and fraternities. That such character building organizations tend greatly to prevent delinquency in children who otherwise might be drawn into such class, and they also teach other matters which are invaluable throughout life to their members. That plaintiff, if given the exclusive custody of said children, will deprive said children of the benefits of the teachings of such groups as above mentioned, and will tend to prevent said minors from associating with loyal Americans;

"That the said minor girl is too young as yet to be impressed with the teachings of plaintiff, and she will suffer no harm or detriment until she has reached the school age of six years;

"*That for the reasons stated the mother is not a fit and proper person to have the sole custody of the said children,* but on the other hand the father is a fit and proper person to have their care and custody after they reach school age of six years. Under the facts found it is fit and proper that the father have the custody of said minor boy for the school term; and that as soon as the minor girl reaches the age of six years that he also have her custody and control during the school term, all for the purposes aforesaid; and it is further ordered that the mother have the custody of said minors during the vacation period." (Italics ours.)

The interlocutory decree of divorce was modified accordingly and plaintiff has appealed on the ground that the trial court abused its discretion, that the evidence does not support the findings and the findings do not support the order and judgment.

■ A review of the testimony in the case reveals that no evidence was produced by petitioner to support the allegations of his affidavit that the place where the children were living was an unfit or improper place, and as for the allegation that Mrs. Cory was teaching the children to disrespect the United States and its flag, she testified as follows:

"I respect the Flag, and as far as flags go my pledge goes and my salute goes to Jehovah. Whether it was the American Flag or any other flag my salute would be to Jehovah and not the flag." Under questioning by the court she testified as follows:

"THE COURT: . . . Q. Mrs. Cory, I presume you do know, and it is a matter of judicial notice, apparently, that the religion of the Jehovah Witnesses is not to salute the Flag. You know that, don't you? A. Yes. We would not salute the Flag.

"Q. You would not salute the Flag under any circumstances. You would stand up? A. I would stand at attention and respect the Flag.

"Q. But you would not salute it? A. No. I salute no flag.

"Q. You would not teach, you would not permit the children to salute the Flag? A. I would teach them the way I believe.

"Q. In other words you would teach them not to salute the Flag, to stand up, and not salute the Flag? A. I would teach them to respect it, but not salute it.

"Q. How about a war? Would you teach them that it was against your religion to go to war, that they should not support the war in case of emergency, war with another country? A. That is right.

"Q. In other words, you would bring the children up so they would be I presume what we call conscientious objectors against war? A. Yes. The Bible tells us, 'Thou Shalt Not Kill.'

"Q. I am not concerned with the Bible. I am trying to find what you think about it and how you are going to raise these children. So if the children were old enough now to be called for the Service what would be your attitude on that? A. If they were old enough it would be their decision, not mine.

"Q. You would not discourage them? A. That would be their decision.

"Q. I am talking about you raising them. A. I would raise them not to fight any wars.

"Even to protect their own country? A. That is right. . . ..

"Q. Well, anyhow Mrs. Cory your teachings would be I presume as you say, that you would teach them to respect the Flag, but not to do anything in a military way or otherwise to protect the Flag, or to have anything to do with the Flag.

That would be your teachings, wouldn't it? A. Not to put the Flag first.

"Q. Well, put the Flag any place. According to your teachings the Flag is a piece of bunting, according to your teachings? A. It represents the powers of this world to us.

"Q. Represents the powers of this world? A. The American Flag would be representing the worldly element, and I believe that we should have nothing to do with the worldly element....

"Q. Well, if there was a parade going by, and the Flag was going by, how would you teach the children to act about that time? A. I would have them stand at attention....

"Q. I am not trying to find out what the teachings of the Witnesses of Jehovah are. I am just trying to find out what you would teach these children. Would you ever fly the Flag, according to your teachings to your children, at your home? A. We have the Flag in our home, yes.

"Q. You have it on display? A. We have two small flags in our home.

"Q. And why do you put those out?. A. We respect it.

"Q. Well, in what way, Mrs. Cory, do you respect it? A. Well, we believe, we 'render unto Caesar the things that are Caesar's and unto God the things that are God's', the way our study of the Bible has brought it out to us....

"Q. Well, let me ask you this—I don't want to take too long—as a matter of fact I presume from your statements and other things, that you would raise these children to respect the flag but under no circumstances to salute it, is that it? A. That is it.

"Q. Because you think that, religiously, that it is wrong to salute anything, is that it? A. That is it.

"Q. And so it wouldn't make any difference, no matter what circumstances existed, the children would be taught never to salute the Flag? A. I am trying to live a Christian life the way it seems to me."

As for the finding of the trial court that the teachings of appellant have so imbued the minor son with disrespect for the flag and unpatriotic thoughts that when it is displayed he becomes ill at ease and greatly agitated, the only testimony upon which such a conclusion could be based is testimony of respondent and his woman friend who accompanied him when he took the children to a movie, that when the flag was shown on the screen the little boy at first clapped, but later said he

wanted to go home, that "Mama says that flag is no good." However, during the hearing the court interrogated the children as follows:

"Jimmie, you see this flag? Do you know what it is? Don't you know what kind of flag it is? [JAMES DEAN CORY]
A. American.

"Q. American Flag? A. Yes.

"Q. What do you think about it? Does your Mama tell you anything about the Flag? A. (Nods No.)

"Q. Do you think it is all right? A. (Nods Yes.)

"Q. The American Flag? A. Yes.

"Q. Well, who has been talking to you about that, your mama? A. She don't remember.

"Q. Oh, yes, Jimmie; now you know about this Flag, don't you? A. Yes, but I don't remember.

"Q. Don't remember what? A. What mama said.

"Q. Don't remember what mama said. Well, do you believe in saluting the Flag? A. I don't know.

"Q. You don't know. How old are you, Jimmie? A. Six.

"Q. Six years old. Well, when all the children at school salute the Flag, do you salute it?

"MR. DWYER: He doesn't go to school, your Honor. He has not started to school yet.

"THE COURT: Q. Have you started to school? A. No.

"Q. Does your mama tell you much about the Flag, Jimmie? A. I don't know.

"Q. Don't tell me you don't remember, Jimmie. A. I don't know.

"Q. Don't be scared. We are just talking it over. You know about this Flag, don't you? Don't you know anything about it? A. (Nods No.)

"Q. How about your sister? How old is Sister? A. Three.

"Q. Three.

"THE COURT: I suppose Sister is too young. Sister, do you know anything about the Flag?

"BARBARA KAY CORY: (Nods No.)"

As to the finding of the trial court that the teachings of the children's mother will prevent them from becoming "loyal American citizens," and will prevent them from joining any of our leading character building groups and organizations as well as the leading fraternal organizations, and will tend to prevent them from associating with "loyal Americans," these are but generalizations and conclusions, without defini-

tion as to what constitute "loyal American citizens," "loyal Americans," etc., it being assumed, apparently, that those who refuse to *salute* the flag and do not believe in war because of adherence to the commandment that "Thou shalt not kill," are for these reasons alone to be considered as "disloyal Americans," and not "good American citizens." But Jehovah's Witnesses are not the only religious group that, adhering with what we might believe to be too strict adherence to the teachings of Christ, refuse, to a greater or less extent, to participate in waging war. One need not go far back into the history of this country to find men conceded to be great Americans who were taught such principles as a part of the religious faith of their fathers and mothers and the religious organizations of which they were members. A striking example of this should occur to the mind of anyone familiar with the religious background of a living American whom history will doubtless record as one of the greatest military leaders of all time. As for the conclusion that appellant's teachings will prevent these children from joining "our leading character building organizations"—whatever they may be—adherence to the teachings of any one religious group may have the effect of excluding its adherents from membership in organizations built upon the creeds of other dissenting religious groups, but such fact should have no bearing upon the rights of parents to bring their children up in their own faith, nor justify courts in arrogating to themselves the right to determine that the religious teachings of such parents will not be for the best interests of their children. Aside from the fact that she is a Jehovah's Witness there is no contention that appellant is not a fit and proper person to have the custody of her infant children. The court stated, as above set forth, that she is a moral person, and her teachings of the Scriptures to her children may, in themselves, be quite as "character building" as would membership in the groups and organizations of whose benefits the trial court fears these children may be deprived if left in their mother's custody.

The conclusion seems inescapable that appellant has been deprived of the custody of said children solely because she is a Jehovah's Witness, and, in the opinion of the trial court, the beliefs of the followers of that faith are inimical to the welfare of their children because they do not salute the flag and are unwilling to fight for their country. If it is right

to take these children from their mother's custody for the reasons stated, then by the same course of reasoning we must conclude that it would be right and proper to deprive all Jehovah's Witnesses of custody of their offspring lest they become disloyal citizens. Also it would seem to follow that the teachings of this group should be prevented by the state as inimical to the public welfare.

We have been cited to no case, and believe none will be found, wherein it has been held that the courts may deprive parents of the custody of their offspring because of a disagreement with such parents as to their religious views, at least, as long as their teachings do not conflict with the laws of the land. While respondent argues in his brief that there is no religious issue in this case, and asserts that the question is whether a father should have the right to have his children taught the "principles of good citizenship," it is patent that both respondent and the trial court are of the opinion that the religious teachings of appellant are incompatible with what *they* consider the "principles of good citizenship."

It is true that the trial court did say:

"Now, I don't have to decide a question of religion at all. It is a question of whether or not the mother or the father should have something to say about bringing up these children and their welfare, if it is right to teach them those things—well, that is one thing—if it is right to teach them, as I call it, non-patriotism, because after all if you are passive on these things you might as well be against them. . . . I am not going to interfere in any way with their religion, but I do say these children have a right to be brought up to choose what they want before they become a member of the faith that they have described here.

"And I am not going to ask the woman to change the religion, . . . But these children are at least going to be given a chance to understand while they are young these other matters. . . .

"I don't want her to change her religion. All I want her to do is to agree, to say whether she would agree to teach these children, like the other hundred million children are taught, to not only respect the Flag but to salute the Flag when the Flag goes by, or wherever they are so that, as I say, they could join a thousand institutions which they would not be able to join otherwise, so that they would be able to work actively for this Flag in case of danger. . . .

"Let her think it over. I am not anxious to have the children taken. I want her to agree, if the children are kept with her part of the time, or all of the time, I want her to agree to teach them like other children are taught, to respect the Flag and salute the Flag, and defend the country when it has to be defended, and not be a shirker in war, not passive but active."

While the court in the foregoing disclaims any desire to interfere with plaintiff's religious views, and attempts to base his decision on "patriotism," it is apparent that he considers it unpatriotic to refuse to *salute* the flag, and believes that a mother who teaches her children that it is wrong to kill and right to refuse to participate in wars, is unfit to have the custody of her children; for only on these grounds has it found that she "is not a fit and proper person to have the sole custody of the said children." In so concluding we think the said court abused its discretion. Differ as we may, and, we might say, as most of us do, as to the wisdom and soundness of the reasoning of plaintiff and her fellow Witnesses, it is not for courts to say that her religious convictions and those of her associates are necessarily such as to jeopardize the interests of their children.

As to the refusal of Jehovah's Witnesses to *salute* the flag, the Supreme Court of the United States, in *West Virginia State Board of Education* v. *Barnette,* 319 U.S. 624 [63 S.Ct. 1178, 87 L.Ed. 1628, 147 A.L.R. 674], in holding that the action of the board of education in requiring public school pupils to salute the flag while reciting a pledge of allegiance, under penalty of expulsion, transcended constitutional limitations and invaded the sphere of intellect of which it is the purpose of the First and Fourteenth Amendments of the Constitution to reserve from all official control, said, pages 640-641 (L.Ed. 1639):

"Struggles to coerce uniformity of sentiment in support of some end thought essential to their time and country have been waged by many good as well as by evil men. Nationalism is a relatively recent phenomenon but at other times and places the ends have been racial or territorial security, support of a dynasty or regime, and particular plans for saving souls. As first and moderate methods to attain unity have failed, those bent on its accomplishment must resort to an ever increasing severity. As governmental pressure toward unity becomes greater, so strife becomes more bitter

as to whose unity it shall be. Probably no deeper division of our people could proceed from any provocation than from finding it necessary to choose what doctrine and whose program public educational officials shall compel youth to unite in embracing. Ultimate futility of such attempts to compel coherence is the lesson of every such effort from the Roman drive to stamp out Christianity as a disturber of its pagan unity, the Inquisition, as a means to religious and dynastic unity, the Siberian exiles as a means to Russian unity, down to the fast failing efforts of our present totalitarian enemies. Those who begin coercive elimination of dissent soon find themselves exterminating dissenters. Compulsory unification of opinion achieves only the unanimity of the graveyard."

Also, pages 641-642 (L.Ed 1639):

"To believe that patriotism will not flourish if patriotic ceremonies are voluntary and spontaneous instead of a compulsory routine is to make an unflattering estimate of the appeal of our institutions to free minds. We can have intellectual individualism and the rich cultural diversities that we owe to exceptional minds only at the price of occasional eccentricity and abnormal attitudes. When they are so harmless to others or to the State as those we deal with here, the price is not too great. But freedom to differ is not limited to things that do not matter much. That would be a mere shadow of freedom. The test of its substance is the right to differ as to things that touch the heart of the existing order.

"If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein. If there are any circumstances which permit an exception, they do not now occur to us." And Mr. Justice Murphy, in his concurring opinion, said, pages 645-646 (L.Ed. 1641):

"Without wishing to disparage the purposes and intentions of those who hope to inculcate sentiments of loyalty and patriotism by requiring a declaration of allegiance as a feature of public education, or unduly belittle the benefits that may accrue therefrom, I am impelled to conclude that such a requirement is not essential to the maintenance of effective government and orderly society. To many it is deeply distasteful to join in a public chorus of affirmation of private belief. By some, including the members of this sect, it is apparently

regarded as incompatible with a primary religious obligation and therefore a restriction on religious freedom. Official compulsion to affirm what is contrary to one's religious beliefs is the antithesis of freedom of worship which, it is well to recall, was achieved in this country only after what Jefferson characterized as the 'severest contests in which I have ever been engaged.'

"I am unable to agree that the benefits that may accrue to society from the compulsory flag salute are sufficiently definite and tangible to justify the invasion of freedom and privacy that is entailed or to compensate for a restraint on the freedom of the individual to be vocal or silent according to his conscience or personal inclination."

In *Stone* v. *Stone*, 16 Wn.2d 315 [133 P.2d 526], the court had before it a situation similar to that presented in the case before us, the question being whether the trial court, in a divorce proceeding in which a decree had been entered in favor of the husband, was justified in awarding the custody of the children of the contesting parties to the father because the mother was a member of Jehovah's Witnesses, whose teachings, the court felt, were inimical to the rearing of children as American citizens. The Supreme Court, in reversing the judgment of the trial court, stated, a⁺ page 527 [133 P.2d] :

"Jehovah's Witnesses has existed since about 1878, and as we understand it, its members' refusal to salute the flag is not because they do not honor the flag, but because of an honest conviction, based upon their interpretation of the Bible, that saluting the flag is making it an image of the power to which one looks for salvation, and that to salute such an image ignores Almighty God, from whom alone salvation proceeds. Jehovah's Witnesses do not teach any violation of the laws of the state which are in harmony with God's laws, but if the law of the state is in direct violation of God's law, they will obey God's law first and all the time."

The court also cited and quoted from *Reynolds* v. *Rayborn* (Tex.Civ.App.) 116 S.W.2d 836, in which case a father had been deprived of the custody of a twelve-year-old daughter, because both father and child were Jehovah's Witnesses and refused to salute the flag of the United States. The court there said, in reversing the order of the trial court:

"History is replete with the bigotry, intolerance, and dogmatism of religious sects, and the pages thereof are strewn

with martyrs who died for their faith. The divergence in creeds, the evils growing from a union of church and state, and the conflicts for supremacy waged between the two were studied and considered by the colonial pioneers who established the independence of these United States. They profited by peoples whose experiences in government had failed, as well as by the achievements of those whose governments had been more successful, and to avoid the griefs and disasters arising from the bigotry and religious intolerance of the preceding ages, they provided in our fundamental laws, Amendment 1 of the Constitution, of the United States, that the 'Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof.' ''

Reference was then made to a provision of the Texas Constitution which, in substance, like article I, section 4, of the California Constitution, guarantees the free exercise and enjoyment of religious profession and worship without discrimination or preference, and the court added:

''The flag is emblematic of the justice, greatness, and power of the United States—these, together, guarantee the political liberty of the citizen, but the flag is no less symbolic of the justice, greatness, and power of our country when they guarantee to the citizen freedom of conscience in religion—the right to worship his God according to the dictates of his conscience. Beyond my comprehension are the vagaries of people who claim and accept the protection of their government in order to worship God according to the dictates of their conscience, but refuse to salute their country's flag in recognition of such protection. Yet, however reprehensible to us such conduct may be, their constitutional right must be held sacred; when this ceases, religious freedom ceases.''

While it is apparent in this case that the court considered the fitness of the mother to have the custody of her children, and found that the teachings of the father will be for the best interests and welfare of these children, the record is singularly barren of any evidence to show the fitness of the father to have such custody. It seems to have been assumed that if the children are given into his care it will naturally follow that they will be reared to be good and loyal American citizens, without any predilections which would disqualify them from joining any of the character building groups or fraternal organizations referred to by the trial court. But there is no

evidence as to what the father purposes to teach these children or what he wants them to be taught. The court refused to admit proffered evidence to show the grounds upon which the divorce was granted to plaintiff, and that respondent left appellant on account of another woman with whom he was living. Cory admitted that he had written a letter to Mrs. Cory in which he told her that he had been drunk for a week, though he denied that such statement was true. He said that he did not himself go to church when living with Mrs. Cory, but that when he did go to church he attended the Catholic church. He admitted that he had at the time no home of his own to which to take the children, but stated that he was trying to get an apartment and if successful his sister, whose husband was absent on military service, would live with him and take care of them; but there was no showing as to what said sister would teach them, what her religious beliefs were, if any, or that she was especially fitted to or would teach the children to be patrotic and good and loyal American citizens, or have them join the Boy or Girl Scouts, etc.

It is generally recognized that in awarding the custody of children what appears to be for their best interests in respect to their temporal, mental and moral welfare shall govern; that as between parents adversely claiming custody, neither parent is entitled to it as of right, but, other things being equal, if a child is of tender years it should be given to its mother. This rule is set forth in section 138 of our Civil Code, and has been stated and applied by the courts in innumerable cases. It has often been stated, as well, that what is for the best interests of children is a matter resting in the sound judicial discretion of the trial court, and that such discretion will not be disturbed on appeal in the absence of a showing that it has been abused. As to what constitutes an abuse of discretion perhaps no general rule has yet been formulated which is applicable to all cases, but appellate courts, not infrequently, have held that trial courts have abused their discretion in awarding custody of children. (See *Washburn* v. *Washburn,* 49 Cal.App.2d 581 [122 P.2d 96] ; *Moon* v. *Moon,* 62 Cal.App.2d 185 [144 P.2d 596] ; *Stever* v. *Stever,* 6 Cal. 2d 166 [56 P.2d 1229].)

It also has been held in numerous decisions in this state, that where a court has, by its order, once provided for the custody of children, such order should not be disturbed unless a change

of circumstances has been shown; that the burden is on the moving party to show such change of circumstances as justifies a change of custody; and that all presumptions are in favor of the reasonableness of the original decree (*Prouty* v. *Prouty,* 16 Cal.2d 190, 193 [105 P.2d 295] ; *Foster* v. *Foster,* 8 Cal.2d 719, 726-727 [68 P.2d 719] ; *Olson* v. *Olson,* 95 Cal.App. 594, 597 [272 P. 1113] ; *Gavel* v. *Gavel,* 123 Cal.App. 589 [11 P.2d 654] ; *Moon* v. *Moon, supra; Washburn* v. *Washburn, supra).*

We think that in this case the trial court—probably because of his own intense patriotism and loyalty to his country in time of war, and a not unnatural irritation at the attitude of mind of persons who, though they blandly accept the protection of a government which guarantees them the right to religious freedom, are unwilling to fight for its preservation, and who in the light of the present world conflict still insist that by inaction their rights and their lives will be preserved by a divine Providence without the necessity of fighting for them—lost sight of the constitutional provisions which guarantee religious freedom to all, and, in depriving this mother of the custody of her children because of her religious convictions, has deprived her of a constitutional right which she may not be compelled to exercise only conditionally, and in so doing has exceeded the bounds of wise judicial discretion.

The order appealed from is reversed.

Peek, J., and Thompson, J., concurred.