CRAIG ET UX. *v.* STATE

[No. 47, September Term, 1959.]

*Decided November 17, 1959.*

The cause was argued before BRUNE, C. J., and HENDER-
SON, HAMMOND, PRESCOTT and HORNEY, JJ.

*Vincent R. Groh* and *Jacob B. Berkson,* for appellants.

*James O'C. Gentry, Assistant Attorney General,* with whom were *C. Ferdinand Sybert, Attorney General,* and *James F. Strine, State's Attorney for Washington County,* on the brief, for appellee.

PRESCOTT, J., delivered the opinion of the Court.

Ollen O. Craig and Lillian S. Craig, his wife, appellants, were tried and convicted, before a judge and jury, in the Circuit Court for Washington County of the crime of involuntary manslaughter. They were indicted separately, but the cases were consolidated for trial. From sentences imposed as a result of their convictions, they have appealed.

The State proceeded upon the theory that the defendants were grossly negligent, as the parents of their deceased minor child, Elaine, in failing to supply medical care for the child during an illness that proved fatal. The defendants contend here that their motions for directed verdicts should have been granted for several reasons: (a) that there was no duty imposed upon them by law to furnish medical attention for their child; (b) that, assuming there were negligence upon their parts, the State failed to prove that such negligence was gross or culpable, and that it caused the child's death; (c) that they are conscientious believers in the Church of God and base their belief in divine healing on that portion of the New Testament, the Epistle of James 5:14, 15—"If there be any sick among you, let him call in the Elders of the Church," and when their child became sick, they cared for it in accordance with the teachings of the Bible, which is a legally permissible equivalent of, or a substitute for, medical attention; hence they did not neglect any duty imposed upon them, and the evidence was insufficient to submit the case to the jury trying them for manslaughter; and (d) that they were convicted without due process or equal protection of the law.

State Trooper Hasenbuhler, the first witness called by the State, had taken a statement from the defendants the day after the child's death. In substance, they told the trooper that the child was nearly six months' old and had been sick for about

594

eighteen days before its death, during which time it had had no medical care due to their religious training, but they had treated it constantly and tenderly during the entire time in accordance with their religious convictions; that during the initial stages of the child's illness it did not seem to be very ill, her condition being "sort of up and down," and she would seem to rally and seem to be fine and, at other times, she seemed to be sick and "wouldn't take nourishment too well"; that "at stages" the child had difficulty in breathing and they noticed a swelling in her left arm, which the defendants thought would leave as soon as the child was well; and that *during the last two days* the child seemed to get worse and finally died on November 25, 1958.

Dr. Roy B. Turner, Associate Pathologist of Washington County Hospital, performed an autopsy upon the child during the afternoon of the day of its death. He stated the primary condition that he found was extensive pneumonia of both lungs in an advanced state, "with complication of acute suppurative arthritis in the elbow joint and some hemorrhage in the adrenals." He made an examination to determine the type of organism responsible for the infection, and found it to be sensitive to all the antibiotics (nine in number) with which it was tested. When asked, "As a medical doctor, then, you can state that this antibiotic would have destroyed the germ [that which infected the child's lungs], is that correct?" he replied, "Not necessarily, there is an implication there that the drugs might have been useful in treating the disease." He was then asked the specific question, "Doctor, from your examination, can you state whether or not medical treatment would have prevented the child's death?" to which he replied, "It would depend, of course, this would only be a speculative manner, would depend on the time at which the treatment was instituted and whether the individual responded to treatment and so forth." Finally, in response to a question by the court asking if the doctor could give an opinion on whether, if antibiotics had been administered, "it *could* have brought about recovery," he answered, "I would think that if appropriate treatment were given that the possibilities

would have been excellent that the infection could have been controlled." (Emphasis added.)

Dr. Wells, the County Medical Officer, saw the child shortly after its death and ordered the autopsy made. He examined the reports of the sensitivity tests and they showed that the organisms in the child's lungs would have responded to treatment with antibiotics; he thought that early use of penicillin, alone, "would probably have cured the child," and he would say that if antibiotics had been administered in the *first week* of the child's illness, it would have "had a very good chance of recovery." This and Dr. Turner's statements, quoted above, was all of the expert testimony that related to the cause of the child's death; and, at this point, the State rested.

Mr. Craig took the stand and made a lengthy statement, which was fully concurred with by Mrs. Craig, but only a very small portion of which had any relevancy to the issues involved. He made it crystal clear that the reason the child received no medical aid or assistance, either as a result of his efforts or Mrs. Craig's, was due to their religious trainings and convictions, "based on the word of God," and not from any inability on their part, financial or otherwise, to procure the same.

Several other witnesses were called on behalf of the defendants, but the only relevant part of their testimony of any substance was a corroboration by Alice Marquiss that the seriousness of the baby's condition was not apparent from the beginning of its illness. She stated, "the baby was up and down"; she knew it was seriously ill on the last Saturday (November 22) before its death, and this was "noticeable," at that time, to both Mr. and Mrs. Craig.

At the conclusion of the testimony, the motions for directed verdicts were renewed, and denied by the court; the cases were submitted to the jury, which returned guilty verdicts, and, thereafter, sentences were imposed.

(a)

In resolving the questions here to be determined, it will be unnecessary for us to determine whether, at common law, the failure of parents to supply medical care for their ill minor

child, who died as a result thereof, due to a conscientious religious belief, constituted involuntary manslaughter. Cf. *Reg. v. Wagstaffe,* 10 Cox C. C. 530; *Reg. v. Hines,* 80 Cent. Crt. 309. In Maryland, we have a statute which provides that the father and mother are jointly and severally charged with the "support, care, nurture, welfare and education" of their minor children. Code (1957), Article 72A, Sec. 1. While this statute does not mention "medical care" in specific terms, we have no hesitancy in holding that it is embraced within the scope of the broad language used. *State v. Waller,* 136 P. 215, 216 (Kan. 1913); *Morse v. Powers,* 45 Vt. 300; *Owens v. State,* 116 P. 345 (Okla. Crim.); *State v. Langford,* 176 P. 197 (Ore.); *Gibson v. Commonwealth,* 50 S. W. 532 (Ky.); *Wallace v. Cox,* 188 S. W. 611 (Tenn.); *State v. Moran,* 121 A. 277, 279 (Conn.).

And it is almost universally recognized that where the defendant owed to a deceased person a specific legal duty, but failed to perform the same, and death resulted to the deceased because of the non-performance of the duty, (at least under circumstances where the failure to perform constituted gross and wanton negligence) the defendant is guilty of involuntary manslaughter. 1 *Warren, Homicide,* Sec. 122, states the principle rather succinctly, as follows:

> "Where the defendant owed the deceased a legal or contractual duty, any omission of the duty resulting in the death of the deceased renders the defendant chargeable with manslaughter. The duty must have been a plain one which he was bound by law or contract to perform personally. A criminal intent is not a necessary element of the offense. The breach of duty need not have been a criminal offense. * * *.
>
> "The defendant is guilty of manslaughter where he neglected to provide his wife with necessaries or with medical attention, or an infant in his charge with medical attention; * * *"

See also *Wharton, Homicide* (3rd Ed.), Sec. 452; 1 *Wharton, Criminal Law* (12th Ed.), Sec. 485; Annotations, 10 A.L.R. 1137, 12 A.L.R. 2d 1047; *Reg. v. Cook,* 62 J.P. (Eng.) 712;

*Reg. v. Downes,* 13 Cox C.C. 111; *Commonwealth v. Comber,* 87 A. 2d 90 (Pa. Super.); *State v. Barnes,* 212 S. W. 100 (Tenn.); *Stehr v. State,* 139 N. W. 676 (Nebr.); *State v. Staples,* 148 N. W. 283 (Minn.). There are other States that have made similar rulings. Cf. *Neusbaum v. State,* 156 Md. 149, 155, 143 A. 872; *People v. Pierson,* 68 N. E. 243 (N. Y.). *Contra: Bradley v. State,* 84 So. 677 (Fla.).

(b)

Of course, we do not intend to intimate that parents must call in medical aid every time a child is taken sick or becomes ill—for every prick of the finger or splinter to be removed. There are numerous occasions when the child's complaint may be trifling and not of a serious nature, so that it may be overcome by the ordinary household nursing by members of the family. Parents are, and should be, vested with a reasonable discretion in this regard. These facts were specifically acknowledged and noted in *Stehr v. State* and *People v. Pierson,* both *supra.* We have repeatedly said that negligence and reasonable care are relative terms, which derive their only significance from a factual background, and to establish civil liability, the rule, generally, is a failure to use that degree of care and caution that an ordinarily careful and prudent person would exercise under like circumstances. But, in Maryland, if the basis of the charge be felonious negligence as it is in the instant case, it must have been gross or criminal negligence, *Neusbaum v. State, supra,* 156 Md. 149, 162, which has been interpreted by this Court to mean "a wanton or reckless disregard for human life." *Hughes v. State,* 198 Md. 424, 432, 84 A. 2d 419; *Thomas v. State,* 206 Md. 49, 51, 109 A. 2d 909; *Clay v. State,* 211 Md. 577, 128 A. 2d 634. (All cases of manslaughter by automobile—a misdemeanor in Maryland.) And, in order to sustain a conviction of involuntary manslaughter, the gross and criminal negligence must be the proximate cause of death. 1 *Warren, Homicide,* Sec. 59, p. 175; *Wharton, Homicide* (3rd Ed.), Sec. 449; 1 *Wharton, Criminal Law* (12th Ed.), Sec. 446.

It is this last proposition that gives us serious difficulty. Was the evidence offered by the State and set forth above

sufficient to sustain a finding that gross and wanton negligence on the part of the defendants proximately caused the child's death? This question must be answered in the affirmative if the convictions are to stand, for no matter how regrettable the child's death, nor how gross the defendants' negligence, may have been, the defendants cannot be held criminally responsible unless there were a causal connection between their negligence and the death that ensued. *Duren v. State,* 203 Md. 584, 593, 102 A. 2d 277. The trial judge, quite frankly, told the jury that, in his opinion, the evidence in this regard was "not too strong."

It seems unquestionably true that pneumonia caused the child's death, and that the deleterious and deadly effects of pneumonia are caused by organisms which, generally, may be controlled if treated by antibiotics in the early stages of the disease. But, in this case, we have no testimony that the seriousness of the child's illness was apparent to the parents until the last two or three days of the child's life, when, according to the medical testimony, the antibiotics would probably have been ineffective to save the child. The fact that the defendants, due to their religious convictions, did not call in medical aid and would not have done so under any circumstances is beside the point, unless their gross and wanton negligence—ordinary negligence being insufficient—caused the child's death. We have pointed out above that parents are vested with a reasonable discretion in regard to when medical attention is needed for their children. If we assume that ordinarily careful and prudent parents would have called in medical aid during the initial stages of the child's illness, and, therefore, the defendants were guilty, at this time, of ordinary negligence in failing to call in a physician, we still find nothing in the testimony that would sustain a finding that during this early period of the child's illness the parents displayed "a wanton or reckless disregard for" the child's life; and, if we assume that the seriousness of the child's illness was easily discernible to them in the last two or three days of its life, so that their failure, at that time, to call in medical aid did constitute gross negligence, the record fails to disclose that this failure was the proximate cause of the child's death, be-

cause, as above noted, the doctors stated that it would then have probably been ineffective to control the disease. We stated in *Baltimore City v. Fire Ins. Salvage Corps,* 219 Md. 75, 82, 148 A. 2d 444, a civil case, that "Negligence and reasonable care derive their only significance from a factual background, and that background must contain evidence of circumstances which justify a legitimate inference that in the exercise of reasonable care and prudence injury could have been avoided." We hold that the State's evidence was not sufficient to sustain a finding that gross negligence on the part of the defendants was the proximate cause of the child's death; consequently, the judgments must be reversed and the cases remanded for a new trial.

## (c)

This being so, it becomes necessary to pass upon the other questions raised by the appellants. As indicated above, one of their main contentions is that if Code (1957), Article 72A, Section 1, or any other statutes in Maryland, required them to obtain medical aid in treating an ailment of their child, it, or they, are unconstitutional and void as depriving them of the free exercise of their religion guaranteed by the First Amendment to the Federal Constitution. The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof * * *," and the Fourteenth Amendment to the Federal Constitution secures against any abridgment of the freedom of religion by the States. *Hopkins v. State,* 193 Md. 489, 496, 69 A. 2d 456.

The authorities are practically unanimous in holding to the contrary of the appellants' contention here. While a person's freedom *to believe* is absolute, his freedom *to act* is not. His *conduct* is subject to regulation for the protection of society, and, while the power to regulate must be so exercised in every case as not to infringe the protected freedom, the State, by general and nondiscriminatory legislation, may safeguard the peace, health and good order of the community without constitutionally invading the liberties guaranteed by the Fourteenth Amendment. *Hopkins v. State, supra,* 193 Md. 496.

As was said by Chief Justice Waite, in *Reynolds v. United States*, 98 U. S. 145, a case which involved the precept of the Mormon religion concerning polygamy, "Laws are made for the government of actions, and while they cannot interfere with mere religious belief and opinions they may with practices."

In prosecutions for the breach of a duty imposed by statute to furnish necessary medical aid to a minor child, the particular religious belief of the person charged with the offense constitutes no defense. He cannot, under the guise of religious conviction, disobey the laws of the land made for the protection of the health and safety of society. It has been said that statutes such as we just mentioned make it the duty of those charged with the care of a child to furnish medical aid to the child, regardless of their religious belief, as such statutes are directed at the acts and not the beliefs of individuals. *Annotation*, 12 A.L.R. 2d 1050. *People v. Pierson*, 68 N. E. 243 (N.Y.), seems to be a leading case upon the subject. After a most interesting and enlightening discourse upon the origin of medical science, the growth of legends of miracles and the intertwining of religion into the treating of sickness, the court held that a statute making the failure to furnish medical attention to a child a misdemeanor as applied to a person believing that prayer was the proper cure for illness was not violative of a New York constitutional provision guaranteeing the freedom of religious worship, since the religious belief secured by the Constitution did not extend to practices inconsistent with the peace or safety of the State, which involved the protection of the lives and health of its children as well as obedience to its laws. The text-writers and cases agree. 1 *Warren, Homicide*, Sec. 122, n. 28, n. 29b; 1 *Wharton, Criminal Law* (12th Ed.), Sec. 415; 26 Am. Jur., *Homicide*, Sec. 108; *Wharton, Homicide* (3rd Ed.), Sec. 452. And cases cited therein. The State of Maryland, as was New York, is vitally concerned with the health and safety of its children and in the obedience of its citizens to its laws. The appellants were, and are, at perfect liberty to believe in the religion of their selection; they may pray, anoint and call in the Elders of their Church in case of sickness of their

minor children; but they, like all parents, must also obey the mandate of Article 72A, Section 1, by providing medical aid when the circumstances properly call for the same.

## (d)

The appellants do not make the basis of their claim that there was a deprivation of "due process of law" perfectly clear. It seems, however, that they argue the State failed to cite any statute prohibiting divine healing or specifically defining the negligent failure of parents to furnish medical care to their sick minor children as manslaughter; consequently, their convictions of that offense deprived them of due process. They cite four Supreme Court cases, *Champlin Rfg. Co. v. Commission*, 286 U. S. 210, *Cline v. Frink Dairy Co.*, 274 U. S. 445, *Connally v. General Construction Co.*, 269 U. S. 385 and *Lanzetta v. New Jersey*, 306 U. S. 451, in support of their claim. These cases dealt with the well known principle that due process of law imposes upon a State an obligation to frame its criminal statutes so that those to whom they are addressed may know what standard of conduct is intended to be required. In the case at bar, we are not called upon to interpret a vague or indefinite statute. Maryland has no statute which specifically declares the grossly and wantonly negligent failure of parents to furnish medical aid to their ill minor child to be manslaughter, but involuntary manslaughter as a result of gross and criminal negligence is part of the common law of Maryland. *Neusbaum v. State, supra,* 156 Md. 155. We find no lack of due process of law here.

The appellants' contention that they were denied "equal protection of the law" contrary to the protection clause of the Fourteenth Amendment is likewise without merit. It is based upon the passage by the Legislature of Code (1957), Article 43, Section 140, which provides that "[N]othing in this subtitle [wherein practitioners of medicine and surgery, etc., are prohibited from treating human ailments without a license] * * * shall prevent any Christian Science practitioner duly registered in the Christian Science Journal * * * from treating human ills in accordance with the tenets of Christian Science or from making an adequate charge for services per-

formed." They complain that they were prosecuted for treating human ills by prayer, when the above section permits Christian Scientists to render such treatment legally. They were, however, not prosecuted because they prayed, but for their alleged negligent failure to provide medical care. While Section 140 *permits* the treating of human ills in accordance with the tenets of Christian Science, it does not, in any manner, render such treatment the legal equivalent of medical care; hence Christian Science parents find themselves under the same duty to provide medical care for their minor children under the provisions of Article 72A, Section 1, when the circumstances require such care, as do all other parents. There is no discrimination here that violates the equal protection clause.

At the trial below, the appellants were not represented by counsel. The record discloses that the learned trial judge, by his commendable conduct of the trial, insured to them an eminently fair and impartial one.

> *Judgments reversed and cases remanded for new trials, the costs to be paid by the County Commissioners of Washington County.*