LEVITSKY *v.* LEVITSKY

[No. 194, September Term, 1962.]

*Decided May 7, 1963.*

The cause was argued before BRUNE, C. J., and HENDERSON, HAMMOND, HORNEY and MARBURY, JJ.

*George L. Clarke,* with whom was *George W. White, Jr.,* and *Buckmaster, White, Mindel & Clarke* on the brief, for appellant.

*William O. Goldstein* for appellee.

BRUNE, C. J., delivered the opinion of the Court.

In this custody case the Circuit Court for Baltimore County by a decree entered May 11th, 1962, awarded custody of the three minor children of the parties to the mother, the respondent-appellee, subject to rights of the father, the complainant-appellant, to visit the children and to have them visit him "at all reasonable times." The decree further provided that the mother is required to "give immediate notice to this Court, in writing, in the event any of the said children shall be admitted to a hospital for care or treatment of any kind." The Circuit Court also retained continuing jurisdiction over the children, so that the Court, *sua sponte,* or on motion of the complainant, may require periodic reports by competent pediatricians, periodic reports of school attendance, achievement and adjustment, and such other information as may be reasonably required, to keep the Court informed of the welfare and progress of the children. The father appeals from the award of custody of the children to the mother and from the denial thereof to him.

The parties were married in 1949 immediately after the father's graduation from the Medical School of the University of Nebraska. The mother was a Registered Nurse. Following their marriage it appears that they lived in or near Chicago and that the children were born there, the eldest in July, 1951, the second in December, 1952, and the youngest in October, 1954. The older two, both girls, were thus aged ten and nine years, respectively, and the third, a boy, seven years, at the time of the hearing in January, 1962. When the parties were married both were members of the Roman Catholic faith. Dr. John M. Levitsky, the appellant, still is, though he is a very irregular attendant at church. In 1956 Mrs. Billie Jean Levitsky, the appellee, became interested in the religious group known as Jehovah's Witnesses, has embraced the doctrines of that group, and she has, we take it, ceased to be a Roman Catholic.

In June, 1959, Dr. Levitsky, having been appointed to a fellowship for some advanced study at the Johns Hopkins Hospital, moved with his family to Baltimore. The parties separated late in 1959. In March, 1960, the husband obtained a divorce in an Alabama court on a ground or grounds not shown in the instant case. The decree of divorce incorporated by reference an agreement and supplementary agreement dated March 1, 1960, between the parties which provided in part: (a) that the mother should have custody of the children during the months when they were required to attend school; (b) that during those months the father should have certain visiting privileges and the right to have them during a part of their holidays; (c) that he should have the right to have each child with him for four weeks in the summer; (d) that the mother should "consult" the father "with respect to all important decisions concerning the education, training and general welfare of the * * * children;" and (e) that "[i]f either of the parties shall have knowledge of any illness, accident or other matter seriously affecting the well-being of any of the children, he or she, as the case may be, shall promptly notify the other and, except in emergencies, shall not take any action without consulting the other."

Since the divorce the mother has continued to live in the

Baltimore area and is a resident of Baltimore County. The children live with her and attend a public school in that county, where they have done very well, in spite of the fact that each of them missed twenty-two days of school in a single school year. Two nights a week, Tuesday from 7:30 to 8:30, and Friday, from 7:30 to 9:30, and Sunday afternoons from 4:00 to 6:00 o'clock, Mrs. Levitsky and the children attend services or meetings at the Jehovah's Witnesses' Kingdom Hall in Lutherville. This hall is about a five minutes' walk from their home. On Saturday mornings the children go "on service" by selling tracts published by the sect, and at times they accompany their mother on door-to-door visits to other persons which she makes for religious purposes.

The father is now Associate Professor of Preventive Medicine at the University of Illinois. He lives in a house which he owns at Oak Park, a suburb of Chicago. His teaching obligations leave him a considerable amount of time when he can be at home, and he made arrangements under which his aunt would act as housekeeper and help to take care of the children, if custody were awarded to him.

There are in this case questions of the relative stability or instability of the parents, of the comparative desirability of the respective homes offered by them, and of lack of frankness in the testimony of each of them. There is also, of course, involved the problem of uprooting caused by a change in custody —a subject which we considered at some length in *Winter v. Crowley,* 231 Md. 323, 190 A. 2d 87. All of these questions are overshadowed here by the question of whether or not the mother should be permitted to continue to have custody of these children in view of her refusal, because of her religious beliefs, to permit her son to have blood transfusions when competent medical doctors deemed such treatment essential to save his life, and because of her announced intention to adhere to the same view, if such a situation should again arise with regard to any of the children.

Judge Raine's opinion in the Circuit Court thus summarizes the facts which present this problem:

> "The attack on her, as custodian of the children, centers on the fact that she is a Jehovah's Witness, and

that because of her religious beliefs at least one of the children has been denied proper medical attention in the past, and that it is a probability, or at least a possibility, that prompt and adequate medical attention may be denied the children in the future. This contention by the husband is dramatically illustrated by recent events. On December 20, 1961, young Nicholas Levitsky was admitted to Mercy Hospital. It became quite obvious that he was hemorrhaging internally, and in the days following his admission his hemoglobin count sank to an alarming degree. Notwithstanding the advice and pleading of the competent physicians at Mercy Hospital the wife flatly refused to permit blood transfusions to be given to her son. The point was soon reached when the doctors advised the mother that the boy could die if blood transfusions were not administered. Notwithstanding this information Mrs. Levitsky signed a paper at the request of the hospital authorities, acknowledging that she was aware that her son might die, and in this document she reiterated her refusal to permit blood transfusions, and absolved the hospital from any responsibility for the death of the boy, which the Court finds as a fact would have inevitably occurred had not the hospital authorities taken other action. When the boy's condition became most critical the doctors were able to talk with the father by telephone, and he gave his permission for the necessary transfusion. At about the same time the hospital staff communicated with [the father's] attorneys [in Baltimore], who presented to Judge Jones of the Supreme Bench of Baltimore City a petition and order assuming jurisdiction over the infant, and authorizing Mercy Hospital to give the child transfusions. This order was signed promptly by Judge Jones, although it appears that, acting on the father's authority, the hospital began the transfusion process prior to the passage of the order. In any event, the transfusions were administered and the child immediately began to rally and was discharged from the hospital as cured on January 10, 1962."

Judge Raine further stated that he would

"have no hesitancy in retaining these children in the care and custody of their mother, save for her unequivocal assertion from the witness stand, that, should the situation arise again, she would deny her children a blood transfusion even if the result of her action was swift and sudden death. The importance of this attitude, and the possibility of dire results that could stem from her inflexible adherence to her religious beliefs cannot be overlooked. Nevertheless, the Court feels that the best interests of the children would be served by allowing them to remain with their mother."

The trial judge in giving his reasons for his conclusion laid stress upon the school reports of the children and the impressions of their teachers therein reflected as showing that the children are intelligent, well behaved and well adjusted. The judge also discussed the change of impression of Dr. Manfred Guttmacher, a distinguished psychiatrist, as to the fitness of the mother to have the children, a change which was based largely upon Dr. Guttmacher's view that the mother's taking her children to a chiropractor for medical treatment indicated grossly defective judgment, in the light of her own training as a registered nurse. Judge Raine thought the premise erroneous. Though our reading of the testimony leads us to believe that there was a rather strong foundation for the premise, we do not believe that the situation with regard thereto was so serious as to be of controlling importance. We note that Dr. Guttmacher declined to rest his change of mind upon the mother's refusal to consent to blood transfusions for the desperately ill boy, which refusal was based upon her religious convictions. He apparently sought to keep clear of that issue. We cannot do so.

The testimony indicates that each of the parents has some neurotic difficulties. The trial judge spoke of the father's "propensity for conscious or subconscious distortion of the truth" and cited as a specific example thereof his denial of having received psychiatric treatment, which was followed by his admission that he had visited a psychiatrist regularly for a period of

eight months. This the father denied constituted treatment, as he interpreted the term. We also note on the other side of the picture a considerable evasiveness on the part of the mother as to several matters, including her taking the children to a chiropractor. We think that the strictures of the trial court on the failure of the father to go to see the ill boy on the night when the father arrived in Baltimore are rather too severe. When the father arrived after two days' driving from Chicago, largely through a blizzard, it was about 10:15 P. M. He ascertained that the boy had rallied and was resting well at the hospital. A visit then could not have helped the boy, as the trial court recognized. It was only through the intervention of the father and of the hospital doctors that the child was given transfusions and that his life was saved. It seems to us rather harsh to charge the father with lack of devotion because he did not pay a useless and perhaps disturbing visit the night of his arrival when the boy was rallying and when it was the mother's obstinate refusal, because of her religious tenets, to allow transfusions that had brought the boy to death's door.

As the case is presented to us, the question is not whether someone else might be a better custodian for these children than either parent, but whether custody should be transferred from the mother to the father. The terms of the settlement agreement approved by the Alabama divorce court are, of course, not controlling in this subsequent proceeding involving custody. It is firmly established by many decisions of this Court that the test in cases involving the custody of children is what is for their best interests. The decision and decree of the Circuit Court are based upon Judge Raine's application of that test to the facts as he found them.

Though, as above indicated, we may not agree with some of his views as to the facts or their significance, we do not regard the case as one in which a change of custody should be made (see *Winter v. Crowley, supra*) unless the mother's attitude with regard to the use of blood transfusions or plasma poses such a threat to the life or health of the children as to require such a change.

The trial judge realized the risk. He said:

"There is a possibility that Nicholas may suffer a recurrence of internal hemorrhaging and this involves a calculated risk, but the risk does not justify depriving all three children of maternal love, for which there is no substitute. Furthermore, there are ways open by which any risk to the children can be minimized."

He sought to guard against this risk by the provisions of the decree requiring immediate written notice to the Circuit Court in the event that any of the children should be admitted to a hospital for care or treatment of any kind, and by the further provisions relating to periodic reports of examinations by competent pediatricians to be furnished upon order of the Court either *sua sponte* or upon motion of the father. We fully agree with Judge Raine that provisions to guard against the risk should be included in the decree, if the mother's custody is to be continued, but we are not convinced of the adequacy of the provisions adopted.

We are, of course, well aware that the mother's refusal to consent to transfusions was based upon her religious convictions, but we are equally well aware that by her adherence to those convictions she jeopardized the life of her son. Under the First and Fourteenth Amendments to the Constitution of the United States, her freedom to believe whatever she chooses is absolute, but her freedom to act is not. *Craig v. State,* 220 Md. 590, at 599, 155 A. 2d 684.

In the *Craig* case a child became ill and some days later died of pneumonia. The parents were members of a sect which believed in calling in the elders of the church, in prayer and in the laying on of hands to cure illness. They followed all of these procedures, but did not call in medical aid and the child died. The parents were then prosecuted and were found guilty of involuntary manslaughter. This Court reversed the conviction because of the insufficiency of evidence to show that the parents were guilty of gross or wanton negligence, as distinguished from ordinary negligence, in failing to seek medical care at the onset of the child's illness, and because it appeared that by the time when the gravity of the child's illness became readily discernible, medical aid would probably have been in-

effective, and hence that it was not established that the negligence of the parents, even if gross and wanton at this later time, was a proximate cause of the child's death.

Because, although the conviction was reversed, the case was remanded for a new trial, this Court, in a carefully considered opinion written by Judge Prescott, expressed its views on questions of law which were expected to recur at the subsequent trial. This was the occasion for the ruling above referred to that a person's freedom to believe is absolute, but his freedom to act is not. This Court went on to say: "His *conduct* is subject to regulation for the protection of society, and, while the power to regulate must be so exercised in every case as not to infringe the protected freedom, the State, by general and non-discriminatory legislation, may safeguard the peace, health and good order of the community without constitutionally invading the liberties guaranteed by the Fourteenth Amendment." (Citing *Hopkins v. State,* 193 Md. 489, 496, 69 A. 2d 456, appeal dismissed, 339 U. S. 940.) This Court also referred to *Reynolds v. United States,* 98 U. S. 145, a case involving a religious precept concerning polygamy, in which Chief Justice Waite said (at p. 166): "Laws are made for the government of actions, and while they cannot interfere with mere religious belief and opinions, they may with practices."

In the *Craig* case it was also held that Sec. 1 of Art. 72A of the Code (1957), which charges both the father and mother, jointly and severally, with the "support, care, nurture, welfare and education" of their minor children, embraced the obligation to furnish medical care.

A portion of Art. 36 of the Maryland Declaration of Rights, which deals with religious freedom, seems pertinent in a situation such as that presented in the *Craig* case and that presented here. Though the opening clause of Art. 36 appears to be no longer tenable under *Torcaso v. Watkins,* 367 U. S. 488 (in which Art. 37 was involved), the declaration that "all persons are equally entitled to protection in their religious liberty" would appear to us to be unexceptionable under the First and Fourteenth Amendments. So, too, we think, is the following clause, which reads: "[W]herefore, no person ought by any law to be

molested in his person or estate, on account of his religious persuasion, or profession, or for his religious practice, unless, under the color of religion, he shall disturb the good order, peace or safety of the State, or shall infringe the laws of morality, or injure others in their natural, civil or religious rights * * *." To deny one's child medical care necessary to save his life because of one's own religious views, falls within the kind of conduct which is not protected by the guaranty of religious freedom contained in Art. 36.

If the mother's religious views did not involve the risk of most serious adverse consequences, we might have a very different situation. There are a number of cases holding that the fact that a parent teaches a child religious doctrines which are at variance with those of the majority is not a ground for a change of custody, and this rule has been applied in cases involving Jehovah's Witnesses and their tenets against saluting the flag, military service and the observance of Christmas, or one or more of those matters. See, for example, *Cory v. Cory,* 70 Cal. App. 2d 563, 161 P. 2d 385; *Jackson v. Jackson,* 309 P. 2d 705 (Kansas); *Smith v. Smith,* 367 P. 2d 230 (Ariz.). The statement in 2 *Nelson on Divorce and Annulment* (2nd Ed., 1961), § 15.04, to the effect that membership in Jehovah's Witnesses is not a disqualification seems to be based upon cases of this type.

Where, however, there is a serious danger to the life or health of a child as a result of the religious views of a parent, the rule seems to be recognized in other jurisdictions which have considered the question that this may bar custody by the parent holding such views, or may call for protection against such views by an appropriate order. An annotation on "Religion as factor in awarding custody of a child," in 66 A.L.R. 2d 1410, states at p. 1430: "* * * where the religious practices of the parent having custody threaten the child's temporal welfare the courts may interfere to protect the child by a change of custody or other appropriate order." See also *Nelson, op. cit. supra,* § 15.03. *Battaglia v. Battaglia,* 172 N. Y. S. 2d 361 (1958), is a case strikingly similar to the instant case, except that in that case there was only the possibility of the happening of such an incident as that which actually occurred here. The Supreme

Court of New York (Special Term, Albany County) awarded custody to the father and said: "Petitioner [mother], of course, enjoys her constitutional right to freedom of religion and may practice the religious faith of her choice without interference. She has not, however, the right to impose upon an innocent child the hazards to it flowing from her own religious convictions. The welfare of the child is paramount. If medical science requires a blood transfusion to preserve the child's life, the child should not be deprived of life because the mother's religious persuasion opposes such transfusion. The child has a right to survival and a chance to live and the court has a duty to extend its protecting arm to the child."

See also: *People ex rel. Trafford v. Trafford,* 12 N. Y. S. 43 (Sup. Ct., Erie Co.), in which the mother was a Christian Scientist and custody which had been in the grandparents was awarded to them; *Comm. ex rel. Derr v. Derr,* 148 Pa. Super. Ct. 511, 25 A. 2d 769, in which the mother was a Jehovah's Witness and custody was awarded to the father for several reasons, one of which was that "* * * we cannot escape the conclusion that she [the mother] regards the observance of her obligations to her denomination and the furthering of its interests as superior to her obligation to care for her children"; *Comm. ex rel. Kaufman v. Kaufman,* 69 Mont. Co. (Pa.) L. R. 292, a case rather similar to and following the *Derr* case; and *Gluckstern v. Gluckstern,* 158 N. Y. S. 2d 504, aff'd 165 N. Y. S. 2d 432 (without opinion), aff'd, *per curiam,* 4 N. Y. 2d 521, in which the mere fact that the mother was a Christian Scientist was held not to disqualify her, *ipso facto,* from having custody of the child, but the award of custody to her was conditioned upon her agreeing to give the boy medical and surgical care and to submit him to a monthly medical examination. There the mother testified that she would follow the order of the court rather than the tenets of her religion. Cf. *Budlong v. Budlong,* 51 R. I. 113, 152 A. 256.

How grave may be the danger of a recurrence of young Nicholas' bleeding ulcer is not clear. The medical testimony here shows only that such an illness is more likely in one who has previously had such an ulcer than in one who has not. Bleeding ulcers are not, however, the only cause for which the use

of blood transfusions or of plasma may be thought necessary by competent physicians and surgeons. That is a matter of common knowledge. It is quite possible that if another occasion requiring a transfusion should arise for this boy or for either of his sisters there might not be time to communicate with the father or to obtain a court order, as there was in December, 1961. There is some risk in leaving the children in the mother's custody at all, whether it be called a calculated risk or not. However it may be designated, it should be reduced to a minimum. We think that if the children are to remain in the mother's custody, this can be accomplished, in view of her declared attitude, only by amending the decree in such manner as to provide that the mother's consent to the use of blood transfusions or of plasma for any of the children shall not be required and by specifying conditions upon which any licensed physician or surgeon in this State may administer blood or plasma when, in his judgment, the administration of blood or plasma shall be necessary to protect the life or health of any of these children. We think that the decree should also have incorporated the requirements of the separation agreement with regard to the wife notifying the husband of illness or hospitalization of any of the children.

We are of the opinion that the Circuit Court would not be in error in continuing custody in the mother under adequate safeguards to protect the life and health of each of the children despite her religious convictions. We think, however, that the safeguards are not adequate and accordingly we remand the case to the Circuit Court for an amendment of the decree in accordance with the views herein expressed.

> *Case remanded with instructions to amend the decree awarding custody to the appellee in conformity with this opinion; the costs to be paid by the appellant.*