Virginia Lynnette FABRITZ, Appellant,

v.

Harry J. TRAURIG, Superintendent, Maryland Correctional Institution for Women, Appellee.

No. 77–1411.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 7, 1977.

Decided Sept. 28, 1978.

Haynsworth, Chief Judge, dissented and filed opinion.

698

Michael S. Elder, Baltimore, Md. (Michael A. Millemann, Joyce R. Branda, Baltimore, Md., The Legal Services Clinic, Alan M. Barr and Anne F. Sirota, Third Year Law Students, Robert D. Klein, Piper & Marbury, Arnold M. Zerwitz and George E. Burns, Asst. Public Defenders, Baltimore, Md., on brief), for appellant.

Stephen B. Caplis, Asst. Atty. Gen., Baltimore, Md. (Francis B. Burch, Atty. Gen. of Maryland and Clarence W. Sharp, Asst. Atty. Gen., Chief, Crim. Div., Baltimore, Md., on brief), for appellee.

Before HAYNSWORTH, Chief Judge, BRYAN, Senior Circuit Judge and RUSSELL, Circuit Judge.

BRYAN, Senior Circuit Judge:

Habeas corpus was refused by the District Court to Virginia Fabritz, a 20-year old mother, who was imprisoned under a conviction and five-year sentence in a Maryland court for abuse—delayed medical attention—touching the death of her daughter, Windy, three years of age. Md. Code Ann. Art. 27, § 35A(a) (Cum.Supp. 1975).[1] The Court of Special Appeals of Maryland reversed, but the Court of Appeals affirmed.[2]

◼ While fully recognizing the lettered study and explication of both the statute and the evidence by the Maryland Judges as well as by the District Judge, we are forced to the view that the conviction is void for denial of Fourteenth Amendment due process. This is because the "conviction [is] based on a record lacking any relevant evidence as to a crucial element of the offense charged," i. e., that the mother had knowledge of the critical gravity of her daughter's condition when she deferred resort to medical advice for the little girl. *Vachon v. New Hampshire,* 414 U.S. 478, 480, 94 S.Ct. 664, 665, 38 L.Ed.2d 666 (1974).

True, she saw the multiple severe bruises (later counted as 70) on the child, apparently caused by body blows, but the testimony indisputably establishes, and the State con-

---

1. § 35A. Causing abuse to child under eighteen.

   \*    \*    \*    \*    \*    \*

(a) *Penalty.*—Any parent, adoptive parent or other person who has the permanent or temporary care or custody or responsibility for the supervision of a minor child under the age of eighteen years *who causes abuse* to such minor child shall be guilty of a felony and upon conviction shall be sentenced to not more than fifteen years in the penitentiary. (Accent added.)

   \*    \*    \*    \*    \*    \*

(b) 7. *"Abuse"* shall mean any: (A) *physical injury or injuries* sustained by a child as a result of *cruel or inhumane treatment* or as a result of malicious act or acts by any parent, adoptive parent or other person who has the permanent or temporary care or custody or responsibility for supervision of a minor child (B) any sexual abuse of a child, whether physical injuries are sustained or not. (Accent added.)

   \*    \*    \*    \*    \*    \*

2. 276 Md. 416, 348 A.2d 275 (1975), *rev'g* 24 Md.App. 708, 332 A.2d 324, *cert. denied* 425 U.S. 942, 96 S.Ct. 1680, 48 L.Ed.2d 185 (1976).

ceded, that she was totally ignorant of when or how they had been inflicted. Indeed, she had been away from home the two or three days previous. Furthermore, mother and daughter loved each other deeply, and the mother set about at once to learn of the child's ailments and to give relief. The narration, in a moment, of the evidence will not reveal a modicum of it as manifesting to the mother the precarious state of Windy's life. Only after watching her for almost eight hours, and then with the assistance of a woman neighbor, did the two of them realize the child's peril. It was then they sought medical advice, but the child died in the ambulance en route to the hospital about one-half hour later.

Appellant, Virginia Fabritz, was indicted in two counts, child abuse and assault and battery. At trial acquittal was ordered on the latter for absence of proof, but the jury found her guilty of child abuse.

The evidence follows. Fabritz resided with her daughter, Windy, in the home of Thomas L. Crockett and his wife, Ann. The child was three years old when, on October 1, 1973, she was left with the Crocketts while her mother went to her grandfather's funeral in another county. She did not again see Windy until her return at one o'clock on the afternoon of October 3d. She was met by Crockett with his motorcycle and with Windy riding in the side car. To the mother the child looked unwell. Crockett attributed this appearance to the bumpiness of the motorcycle ride.

On arrival home about 2:30 that afternoon, Windy began to suffer with cramps and to her mother seemed feverish with the flu. At this time she noted the bruises on her body. After bathing her, Fabritz put her to bed or on a couch. Soon afterwards, Windy was seen to have gotten up and curled herself in a blanket on the floor. At 5:00 the child was semi-conscious and improved, sitting up for a brief interval after receiving some liquid nourishment. Near 6:00 that afternoon, Windy vomited and showed she was not feeling well. At 7:00 she was put back to bed. Believing the child to have a temperature, her mother sent for a thermometer. The little girl was given soda to settle her stomach, as well as more liquid nourishment, and placed in bed again around 7:30 or 8:00.

Fabritz twice telephoned Connie Schaeffer, a neighbor, for assistance, telling her of the child's flu and of her worsening condition. On arrival Schaeffer, too, saw that Windy had a fever. Asked about the bruises on Windy, the mother replied, "Tommy hits hard." They bathed her in alcohol and put her to bed. At this point the child appeared to Schaeffer to be half asleep, neither moaning nor crying.

Schaeffer testified at trial that she did not know what was the matter with Windy, and had left the Crockett house without suggesting medical assistance. Further testimony related that at this moment Ann Crockett arrived home and discussed with Fabritz the procurement of medical attention and Fabritz asked Ann to keep an eye on Windy. The two concluded it was necessary to seek help. Ann called the County Hospital, and was advised by the doctor that the women should bring the child to the hospital.

It was then that Ann, on entering the child's bedroom, perceived she was not breathing. Thereupon she sought an ambulance while Fabritz applied mouth-to-mouth resuscitation. The rescue ambulance took Windy, accompanied by Ann, to the hospital. Meanwhile, Schaeffer saw Fabritz in a hysterical condition, endeavored to calm her and drove her to the hospital, where they were informed the child had been declared dead on arrival at 10:35. In this state she told Schaeffer, "It is my fault, I killed her."

The medical opinion was that 18 to 24 hours before death—during Fabritz' absence from home—the child had been struck in the abdomen by a blunt instrument, possibly a fist, rupturing the duodenum and leading to death from peritonitis. No evidence intimated that Fabritz had knowledge that the person in whose custody Windy was left would abuse her.

At one juncture Fabritz remarked that she had not taken Windy to the hospital because Fabritz "was too ashamed of the

bruises" on her body. On his trial Crockett was acquitted of any connection with the death. At her trial the prosecution conceded that Fabritz had not struck the child.

The Maryland Court of Appeals' conclusion was that Fabritz' "inaction amounted to child abuse;" that her "failure to obtain medical attention" constituted "cruel or inhumane treatment;" and that this treatment was a cause of the child's "physical injury." In determining to grant Fabritz habeas corpus, we accept the statute as valid, as did the Court of Appeals of Maryland and the District Court, and accept, too, their clear exposition of the critical words of the law. The statute simply was unconstitutionally applied.

Our conclusion does not affront the conclusion of the Maryland Court, nor that of the District Court. The three steps of the State Court's reasoning do not preclude a finding that the evidence is wholly wanting in proof of an indispensable factor: that during the three stages of the syllogism Fabritz had knowledge that she was risking the life of her child. That is the decisive issue here.

The evidence is utterly bare of proof of a consciousness of criminality during her bedside vigil. Cf. Morissette v. United States, 342 U.S. 246, 270–71, 72 S.Ct. 240, 96 L.Ed. 288 (1952). This may have been an error of judgment, however dreadfully dear, but there was no awareness of wrongdoing on her part. The jury's contrary verdict on that question finds no warrant in the testimony. Fabritz' error amounted to a failure to procure medical attention in less than eight hours after her arrival at home. Without expert medical knowledge to place her on notice of the fatal nature of the child's illness, she treated her as best she knew. The misjudgment was only to the significance of the symptoms and of the immediacy of demand for professional care. In these circumstances the conviction cannot stand—without even so much as a murmur of evidential justification.

As the Court said in *Thompson v. Louisville,* 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960):

The ultimate question presented to us is whether the charges against petitioner were so totally devoid of evidentiary support as to render his conviction unconstitutional under the Due Process Clause of the Fourteenth Amendment. Decision of this question turns not on the sufficiency of the evidence, but on whether this conviction rests upon any evidence at all. *Id.* at 199, 80 S.Ct. at 625.

\* \* \* \* \* \*

[S]o is it a violation of due process to convict and punish a man without evidence of his guilt. *Id.* at 206, 80 S.Ct. at 629 (footnote omitted).

It would be a radical overthrow of the universal understanding of motherly devotion, as well as the confidence gained by experience to be accorded the judgment of two women having the responsibility of a sick 3-year old, to hold the conduct of the mother or of her friend suspect. Especially is this true when it is remembered that although the child would have survived "had an operation been performed within at least twelve hours prior to death," Fabritz had not even then returned from her grandfather's funeral. The callings of nursing and baby-sitting ought not impose so frightening a trusteeship.

The judgment on appeal will be vacated and the case remanded to the District Court to grant the writ.

Vacated with Directions.

HAYNSWORTH, Chief Judge, dissenting:

I have a great deal of sympathy for this young woman who has spent a time in prison on a conviction of child abuse arising out of the death of her three-year old daughter, though generally the mother had been a loving and considerate one. My sympathy for the mother is enhanced by the fact that the person who inflicted the fatal injury upon the child has remained unpunished. I think, however, that the proof at trial did not permit a conclusion on our part that there was no evidence to support a finding of a violation of the statute by the mother.

Of course, a parent should not go to prison for an erroneous diagnosis of a child's illness, but the Court of Appeals of Maryland has clearly held that the statute is violated if a custodian of a child knowingly withholds medical assistance and if the child's condition is aggravated or if death ensues as a result of want of medical attention.[1]

Indeed, Maryland has long embraced the common law doctrine that one who, through gross negligence, fails to perform a legal duty owing to another as a result of which the other dies is guilty of involuntary manslaughter. *See Palmer v. State,* 223 Md. 341, 164 A.2d 467 (1960); *Craig v. State,* 220 Md. 590, 155 A.2d 684 (1954).

There can be no doubt here that the multiple bruises were not symptomatic of influenza. When the neighbor saw the child, she was moaning in pain. That and her comatose condition should have signalled a more serious condition than the flu. That the mother recognized that there may have been internal injuries is supported by the testimony that she explained the child's bruised condition to the neighbor by saying, "Tommy hits hard."

One may suppose that this three-year old child had told her mother who had beaten her, and the record clearly indicates that Tommy Crockett was the lover of both of the women who shared the house with him. Thus, she explained to the neighbor that she had not sought a physician's help because she was ashamed of the bruised condition of the child's body and that if the child were seen by a physician she would have to explain the origin of the bruises.

I put no great weight on her exclamation after being informed that the child was dead, "I killed her", but her statements to the neighbor before the child was dead of her reasons for not having sooner sought medical help furnished support for a finding that for some hours the mother consciously refrained from seeking medical help to protect Crockett from possible crim-

inal charges and to support her own ego. Though the mother was generally loving and protective of her daughter, a conscious indulgence of such a preference is in violation of Maryland's Child Abuse Law when earlier medical attention might have saved the child's life.

I cannot agree that this conviction was devoid of evidentiary support.

---

1. We are not met with the special problem which might be presented if the parent were a Christian Scientist or if the decision was one of a kind that ought to be left to parental discretion.