PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
  *Plaintiff-Appellee,*

v.

RENE R. BONETTI,
  *Defendant-Appellant.*

No. 00-4616

UNITED STATES OF AMERICA,
  *Plaintiff-Appellant,*

v.

RENE R. BONETTI,
  *Defendant-Appellee.*

No. 00-4653

Appeals from the United States District Court
for the District of Maryland, at Greenbelt.
Deborah K. Chasanow, District Judge.
(CR-99-270-DKC)

Argued: November 2, 2001

Decided: January 10, 2002

Before NIEMEYER and LUTTIG, Circuit Judges, and Frank J.
MAGILL, Senior Circuit Judge of the United States Court of
Appeals for the Eighth Circuit, sitting by designation.

Affirmed in part and reversed in part by published opinion. Judge
Luttig wrote the opinion, in which Judge Niemeyer and Senior Judge
Magill joined.

**COUNSEL**

**ARGUED:** Paul F. Kemp, LAW OFFICES OF PAUL F. KEMP, P.A., Rockville, Maryland, for Appellant. Mythili Raman, Assistant United States Attorney, Greenbelt, Maryland, for Appellee. **ON BRIEF:** Steven M. Dettelbach, Assistant United States Attorney, Greenbelt, Maryland, for Appellee.

---

**OPINION**

LUTTIG, Circuit Judge:

Appellant Rene R. Bonetti challenges his convictions and sentence for conspiracy to harbor an illegal alien, in violation of 8 U.S.C. § 1324(a)(1)(A)(v)(I), and harboring an illegal alien, in violation of 8 U.S.C. § 1324(a)(1)(A)(iii). The United States cross-appeals the district court's refusal to award restitution to Bonetti's victim under the Mandatory Victim Restitution Act. For the reasons that appear, we affirm Bonetti's convictions and sentence, but reverse the district court's judgment denying restitution.

I.

Rene Bonetti and his wife moved to the United States from Brazil in 1979, and brought Hilda Rosa Dos Santos with them to be their domestic servant. J.A. 208-09. From September 1979 to April 1998, Dos Santos worked for the Bonettis in the United States and lived in their home. Although the Bonettis helped Dos Santos obtain a visa and passport, Rene Bonetti kept Dos Santos' passport in his possession while she was in the United States. *Id.* at 210. Bonetti renewed Dos Santos' visa a few times, but did not renew it again after it expired in 1984. *Id.* at 211. From that point on, Dos Santos lived in the Bonettis' house as an unlawful alien. Dos Santos was illiterate and did not speak or understand any English; she spoke only Portugese. *Id.* at 206.

For almost nineteen years, Dos Santos worked for the Bonettis in slavery-like conditions. Dos Santos performed arduous labor for

many hours a day, never receiving payment for her work. In addition, her living conditions were deplorable, and Bonetti's wife physically abused Dos Santos on numerous occasions.

Each day, Dos Santos began work between 6:00 and 7:00 am, continued working until 10:00 pm, and remained "on call" to serve the Bonettis well into the night, sometimes as late as 1:00 am. J.A. 260-61. As part of her chores, Dos Santos cleaned the Bonettis' house every day. *Id*. 451-52. Once a week, Dos Santos washed the inside and outside of the Bonettis' windows. *Id*. at 256. Dos Santos also performed outdoor work such as shoveling snow, *id*. at 253-57, raking leaves, *id*. at 453, walking the Bonettis' dog, *id*. at 351, and washing the Bonettis' three cars, *id*. at 254. When the Bonettis needed a new gas pipeline, Dos Santos spent four days digging a ditch for the pipeline with a pick ax. *Id*. at 258-60.

Although there were many empty rooms upstairs in the Bonettis' $250,000 home, Dos Santos was forced to live in a basement room with no windows or bathroom. J.A. 247. The Bonettis forbade Dos Santos from using their showers; she could bathe only by carrying pails of water downstairs to a tin tub in the basement. *Id*. at 236-46. Bonetti also installed a padlock on his refrigerator to keep Dos Santos from using it. *Id*. at 262.

From the time Dos Santos arrived in the United States, Bonetti's wife violently abused her, sometimes as often as once a day. J.A. 220-21. At first, Bonetti's wife would hit Dos Santos with her closed fist, but later switched to beating Dos Santos with a shoe. *Id*. at 221-22. The beatings were so frequent that Dos Santos was unable to recall the first time she was hit. *Id*. at 222-23. In addition to these routine beatings, there were other, isolated incidents of abhorrent abuse. On one occasion, when Bonetti's wife did not like the way Dos Santos had prepared her soup, she threw the scalding hot soup in Dos Santos' face with a spoon, burning her. *Id*. at 225. On another occasion, Mrs. Bonetti pulled out clumps of Dos Santos' hair, causing her head to bleed, because she did not like the way Dos Santos was washing the Bonettis' dog. *Id*. at 231-32.

Dos Santos suffered further injuries while working for the Bonettis. One day, Dos Santos cut her leg when cleaning up broken pieces of

glass in the Bonettis' house, and her leg became infected. J.A. 265-68. Bonetti purchased gauze and ointment for Dos Santos, but did not take her to the doctor for over a year, even though the wound worsened. *Id*. at 266-67. When finally taken to a doctor, Dos Santos was diagnosed with osteomyelitis and spent four days in the hospital. *Id*. at 561, 564. The infection healed, but left a large scar on her leg. *Id*. at 268.

Dos Santos also developed a cantaloupe-sized tumor in her stomach during her time in the Bonettis' house. She asked Bonetti to take her to a doctor, J.A. 275-76, but he refused. Ultimately, it was determined that the tumor was a benign uterine fibroid. But by the time that Bonetti finally did take Dos Santos to the doctor, a hysterectomy was needed to remove the tumor. *Id*. at 614.

Throughout these nineteen years, Bonetti falsely told Dos Santos that he was paying her wages into a bank account. J.A. 263. When Dos Santos asked if some of her "wages" could be paid directly to her, Bonetti refused to give her anything. *Id*. at 273. Not once did Dos Santos receive payment from the Bonettis for her work.

Based upon these facts, Rene R. Bonetti was charged with, and convicted of, conspiracy to harbor an illegal alien, in violation of 8 U.S.C. § 1324(a)(1)(A)(v)(I), and harboring an illegal alien, in violation of 8 U.S.C. § 1324(a)(1)(A)(iii). The jury found that Bonetti's conspiracy and harboring were "for the purpose of commercial advantage or private financial gain" under 8 U.S.C. § 1324(a)(1)(B)(i), and that "during and in relation to" the conspiracy and harboring Bonetti "cause[d] serious bodily injury . . . to, or place[d] in jeopardy the life of, a[ ] person" within the meaning of 8 U.S.C. § 1324(a)(1)(B)(iii).[1]

---

[1]Title 8, U.S.C. § 1324(a)(1)(B)(i), provides that, "in the case of a violation of subparagraph (A)(i) or (v)(I) or in the case of a violation of subparagraph (A)(ii), (iii), or (iv) in which the offense was done *for the purpose of commercial advantage or private financial gain*," the convicted individual shall "be fined under Title 18, imprisoned not more than 10 years, or both." (Emphasis added).

Title 8, U.S.C. § 1324(a)(1)(B)(iii), provides that, "in the case of a violation of subparagraph (A) (i), (ii), (iii), (iv), or (v) during and in relation to which the person *causes serious bodily injury* (as defined in section 1365 of Title 18) to, *or places in jeopardy the life of*, any person," the convicted individual shall "be fined under Title 18, imprisoned not more than 20 years, or both." (Emphasis added).

Accordingly, Bonetti was sentenced to 78 months imprisonment. J.A. 1271.

From these convictions and sentence, Bonetti appeals.

II.

Bonetti first claims that the district court should have entered a judgment of acquittal on the jury's finding that he, during and in relation to his harboring, "cause[d] serious bodily injury . . . to, or place[d] in jeopardy the life of, any person" under section 1324(a)(1)(B)(iii). Bonetti makes two basic arguments. First, he asserts that the government failed to show that Bonetti himself "caused" Dos Santos' injuries. Second, he claims that the government failed to show that Dos Santos suffered "serious bodily injury" or that her life was in jeopardy. For the reasons that follow, we hold that there was sufficient evidence to support the jury's finding that Bonetti violated section 1324(a)(1)(B)(iii).

A.

Bonetti argues that he did not "cause" the injuries that resulted from his wife's physical abuse of Dos Santos because he had no legal duty to prevent his wife's actions. Under *Pinkerton* v. *United States*, 328 U.S. 640 (1946), however, Bonetti may be held criminally liable for his wife's physical abuse of Dos Santos.

Bonetti does not challenge his conviction for conspiracy to harbor an unlawful alien, and the indictment charged both Bonetti and his wife as co-conspirators. J.A. 13. Accordingly, Bonetti's conspiracy conviction makes him liable for all substantive offenses of his coconspirator that are both reasonably foreseeable and in furtherance of the conspiracy. *See Pinkerton*, 328 U.S. at 646-47.

The record clearly demonstrates that Bonetti's wife's physical abuse of Dos Santos was foreseeable to Bonetti. After Bonetti's wife pulled out Dos Santos' hair in clumps, Bonetti came into the room and saw what had happened, yet left the room without saying anything. J.A. 232. Dos Santos repeatedly complained to Bonetti about

his wife's abuse, J.A. 234, and Bonetti would respond by telling Dos Santos to "pray" for his wife, and that some day the abuse would stop. J.A. 234.

These acts of abuse were undoubtedly committed in furtherance of the Bonettis' conspiracy. The purpose of the conspiracy was to obtain free labor from Dos Santos, and the physical abuse furthered that conspiracy by intimidating Dos Santos from asserting her right to payment or resisting the Bonettis' demands that she work. We therefore conclude that Bonetti may be held liable under *Pinkerton* for any "serious bodily injury" caused by his wife's physical abuse.

Bonetti next claims that he did not "cause" the injuries that resulted from either Dos Santos' leg infection or the uterine fibroid because had no legal duty to help Dos Santos obtain prompt medical care. Appellant's Br. at 19-22. Bonetti is correct to note that a breach of a legal duty, rather than a mere moral command, is necessary to impose criminal liability for a failure to assist one in need. *See Pope* v. *State*, 396 A.2d 1054, 1064 (Md. 1979); *see also* W. LaFave and A. Scott, Substantive Criminal Law § 3.3 (1986) ("For criminal liability to be based upon a failure to act it must first be found that there is a duty to act — a legal duty and not simply a moral duty.").

Under the extraordinary facts of this case, it is apparent that Bonetti did have a legal duty to help Dos Santos get prompt medical care. Although Dos Santos was not a member of Bonetti's family, Dos Santos lived under the same roof as Bonetti for almost fifteen years, and her illegal status, illiteracy, ignorance of English, and lack of money rendered her completely dependent upon Bonetti for her well-being and survival. Dos Santos was as helpless and as dependent on Bonetti as a child living in his house would have been. *See State* v. *Miranda*, 715 A.2d 680, 687 (Conn. 1998) (finding a duty to protect live-in girlfriend's child from abuse); *Davis* v. *Commonwealth*, 335 S.E.2d 375 (1985) (upholding the conviction of a woman for involuntary manslaughter in the death by starvation and exposure of her elderly mother, who lived in the same house); *see also* 1 W. LaFave and A. Scott, Substantive Criminal Law § 3.3(a) ("[I]f two people, though not closely related, live together under one roof, one may have a duty to act to aid the other who becomes helpless.").

Most importantly, Bonetti created a circumstance of *forced* dependency by Dos Santos through his own conduct of retaining Dos Santos' passport in his possession, refusing to renew her visa after it expired, and refusing to pay her for her work.

For these reasons, we conclude that Bonetti may be held criminally liable for "causing" the injuries to Dos Santos' leg and stomach through his failure to seek prompt medical care.

Bonetti's reliance on *Fabritz* v. *Traurig*, 583 F.2d 697, 700 (4th Cir. 1978), in which we held unconstitutional a child abuse conviction where the defendant waited for eight hours before seeking medical care for her daughter, is misplaced. The defendant in *Fabritz* had no criminal mental state *at all*, as the record was "utterly bare of proof of a consciousness of criminality." *Id.* The defendant in *Fabritz* committed a mere "error of judgment," and there was "no awareness of wrongdoing on [her] part." *Id.* Here, by contrast, a reasonable jury could infer a criminal *mens rea* from Bonetti's neglect for Dos Santos' health. There was ample evidence to suggest that Bonetti's reluctance to take Dos Santos to a doctor was the result of a desire to conceal his crime of harboring an unlawful alien, if not of a criminal negligence or reckless indifference to Dos Santos' health. Given that Bonetti waited more than a year to obtain medical help for Dos Santos, J.A. 267, it is impossible to characterize this delay as a mere "error of judgment," especially since Dos Santos repeatedly asked Bonetti to take her to the doctor for her stomach problems, J.A. 275-76, 459, and her leg wound. *Id.* at 267.

### B.

The remaining issue is whether the injuries that Bonetti "caused" qualify as "serious bodily injury." Title 18, U.S.C. § 1365(g)(3), defines "serious bodily injury" as "bodily injury which involves — (A) a substantial risk of death; (B) extreme physical pain; (C) protracted and obvious disfigurement; or (D) protracted loss or impairment of the function of a bodily member, organ, or mental faculty."

A reasonable jury could easily find that Mrs. Bonetti's physical abuse, which included beating Dos Santos with a shoe, J.A. 222, burning her face with hot soup, *id.* at 224-25, and pulling out her hair,

*id.* at 230-31, caused "extreme physical pain," which suffices to show "serious bodily injury" under 18 U.S.C. § 1365(g)(3)(B). Dos Santos testified that when Bonetti's wife pulled her hair out, she "pulled it so violently that my head felt like it just got this big with such pain" and that it caused her head to bleed. J.A. 231.

There was also sufficient evidence for a jury to find that Dos Santos' leg infection and stomach tumor caused "serious bodily injury." Bonetti claims that the government's medical testimony was insufficient to show that Dos Santos suffered serious bodily injury or that her life was in jeopardy from either the leg wound or the stomach tumor. However, Dos Santos herself testified about the "very bad" pain caused by her stomach tumor, J.A. 270, 275, and that her leg infection "would hurt a lot." From this testimony, a reasonable jury could well conclude, beyond a reasonable doubt, that Dos Santos suffered "extreme physical pain" as a consequence of Bonetti's prolonged failure to obtain prompt medical attention for Dos Santos.

The district court properly denied Bonetti's motion for judgment of acquittal, and we affirm the jury's finding that Bonetti "cause[d] serious bodily injury . . . to, or place[d] in jeopardy the life of" Hilda Rosa Dos Santos.

### III.

Bonetti next claims that the district court should have granted his motion *in limine* to prevent the government's medical witnesses from testifying about the extent of Dos Santos' leg injury and stomach problems. Bonetti claims that this evidence was irrelevant under Fed. R. Evid. 401. We need hardly pause over this claim.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable than it would be without the evidence." Fed. R. Evid. 401. Evidence as to the extent of Dos Santos' injuries was unquestionably relevant to show that Dos Santos suffered "serious bodily injury" or that her life was in jeopardy from the leg injury or the stomach tumor. The district court did not abuse its discretion by admitting this evidence.

IV.

Bonetti also challenges the length of his sentence, arguing that the district court improperly departed upward one level from the applicable sentencing guideline range. The district court departed upward because it found that the duration of Bonetti's harboring offense (15 years) was "significantly longer than would be in the heartland of harboring an unlawful alien," and that this constituted "extreme conduct" under U.S.S.G. § 5K2.8[2] and other "grounds for departure" under U.S.S.G. § 5K2.0[3]. J.A. 1227.

Our decision in *United States* v. *Rybicki*, 96 F.3d 754 (4th Cir. 1996), established a five-step analysis to be used by the district courts in deciding whether to depart from an applicable sentencing guideline. First, a district court must determine the circumstances and consequences of the offense, which determination we review only for clear error. 96 F.3d at 757. Bonetti does not challenge the district court's determination that Bonetti harbored Dos Santos illegally for almost fifteen years, and we find no clear error.

Second, the district court must decide whether any of the circumstances and consequences appear "atypical" enough to potentially take the case out of the applicable guideline's heartland. 96 F.3d at 757. The district court identified the duration of Bonetti's offense as a

---

[2]"If the defendant's conduct was unusually heinous, cruel, brutal, or degrading to the victim, the court may increase the sentence above the guideline range to reflect the nature of the conduct. Examples of extreme conduct include torture of a victim, gratuitous infliction of injury, or *prolonging of pain or humiliation*." (Emphasis added).

[3]"Under 18 U.S.C. § 3553(b), the sentencing court may impose a sentence outside the range established by the applicable guidelines, if the court finds 'that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.' Circumstances that may warrant departure from the guideline range pursuant to this provision cannot, by their very nature, be comprehensively listed and analyzed in advance. The decision as to whether and to what extent departure is warranted rests with the sentencing court on a case-specific basis."

potentially "atypical" factor, and we do not review the district court's identification of these potential factors. *Id*.

Third, the district court must classify each factor that could potentially remove a case from the applicable guideline as either: (1) a "forbidden" basis for departure; (2) an "encouraged" basis for departure; (3) a "discouraged" basis for departure; or (4) an "unmentioned" basis for departure. 96 F.3d at 757. We review *de novo* this classification by the district court. *Id*. The district court classified the duration of Bonetti's offense as both "extreme conduct" under § 5K2.8 (an "encouraged" factor, *see* U.S.S.G. § 5K2.1, *et seq*.) and as a "grounds for departure" under § 5K2.0 (an "unmentioned" factor). J.A. 1226. We find no error in the district court's classification of the duration of Bonetti's offense as "extreme conduct," and Bonetti does not challenge this classification. Prolonging a victim's pain or humiliation constitutes "extreme conduct," *see* U.S.S.G. § 5K2.8, and the fifteen-year duration of Bonetti's crime undoubtedly prolonged Dos Santos' pain and humiliation.

Fourth, the district court (assuming, as here, that it determined in step three that the factor is an "encouraged" one for departure) must determine whether the guidelines have already accounted for the factor. If the guidelines have not already taken the factor into account, and if the factor is "encouraged," as is the duration factor in this case, the factor is usually an appropriate one on the basis of which to depart. *See Koon*, 518 U.S. at 93. We review *de novo* the determination of whether an applicable guideline already takes a particular factor into account. *See Rybicki*, 96 F.3d at 758.

The district court concluded that the sentencing guideline for harboring an unlawful alien, U.S.S.G. § 2L1.1, did not take into account the duration of the offense. J.A. 1226-27. We see nothing in the text of § 2L1.1, and Bonetti points to nothing in § 2L1.1, that would require us to disturb this conclusion. Section 2L1.1 provides adjustments for the number of unlawful aliens harbored, *see* § 2L1.1(b)(2), for use of a dangerous weapon, *see* § 2L1.1(b)(4), and for creating a substantial risk of death or serious bodily injury, § 2L1.1(b)(5), but nothing in § 2L1.1 provides an adjustment for the duration of the offense.

Bonetti, however, claims that one of the *adjustment* guidelines on which the district court relied took the duration of his offense into account. Specifically, Bonetti contends that the district court relied on the duration of his offense when making a vulnerable victim adjustment under U.S.S.G. § 3A1.1(b)(1).[4] J.A. 1192-93. We see nothing in the record to support this contention. The district court seems obviously to have based its conclusion that Dos Santos was a vulnerable victim solely on her lack of education, lack of sophistication, illiteracy, ignorance of English, and her "desperate background." J.A. 1192.

Bonetti seizes on the following two sentences uttered from the bench in support of his contention: "It was those traits, that combination of traits that made her especially vulnerable to being harbored and shielded in the defendant's home. *Staying there for however many years without pay.*" J.A. 1192 (emphasis added). We simply do not believe that this passage can reasonably be understood as indicating that the district court relied on the duration of Bonetti's offense in determining that Dos Santos was a vulnerable victim. The only plausible reading of this passage is that the incomplete sentence "[s]taying there for however many years without pay" was merely an afterthought, descriptive of how Dos Santos was "harbored and shielded in defendant's home," *not* as a recitation or finding of a "trait[ ] . . . that made her especially vulnerable." This would especially seem true given that the duration of an offense is logically unrelated to "vulnerability." We therefore conclude that Bonetti has failed to show that the duration of his offense was taken into account by other guidelines.

The fifth and final step in the analysis requires the district court to decide whether a departure, based on these appropriately classified factors, is in fact warranted. *See Rybicki*, 96 F.3d at 758. We review the ultimate departure decision for abuse of discretion, and any factual determinations underlying this decision for clear error. *See id.*

Bonetti contends that the district court abused its discretion in concluding that this case fell outside the "heartland" of the guidelines

---

[4]U.S.S.G. § 3A1.1(b)(1) provides: "If the defendant knew or should have known that a victim of the offense was a vulnerable victim, increase by 2 levels."

because there was no evidence that fifteen years of illegal harboring was "atypical" in duration for this offense. We do not believe such evidence was necessary, however. Because the district court granted a departure for "extreme conduct" under § 5K2.8, the district court needed only to find, as it did, that the duration of Bonetti's offense prolonged Dos Santos' pain and humiliation. Thus, we discern no abuse of discretion in the district court's conclusion that this case falls outside the guidelines' heartland. Accordingly, the district court's one-level upward departure was permissible.

V.

Finally, the government cross-appeals, arguing that the district court erroneously denied its request for restitution of the wages Bonetti should have paid to Dos Santos for her work. On this issue, we disagree with the district court's interpretation of the Mandatory Victim Restitution Act (MVRA), 18 U.S.C. § 3663A, and reverse and remand with instructions to order mandatory restitution for the wages Dos Santos should have received during the time Bonetti unlawfully harbored her.

A.

We first address whether the Mandatory Victim Restitution Act applies to Bonetti's sentencing proceeding. 18 U.S.C. § 3663A(c)(1) states as follows:

> This section shall apply in all sentencing proceedings for convictions of, or plea agreements relating to charges for, any offense—
>
> (A)   that is—
>
> (i) a crime of violence, as defined in section 16;
>
> (ii) an offense against property under this title, or under section 416(a) of the Controlled Substances Act (21 U.S.C. 856(a)), including any offense committed by fraud or deceit; or

> (iii) an offense described in section 1365 (relating to tampering with consumer products); and
>
> (B)   in which an identifiable victim or victims has suffered a physical injury or pecuniary loss.

The district court found that the MVRA did not apply because Bonetti did not commit a "crime of violence." We disagree.

Title 18, U.S.C. section 16 defines "crime of violence" as:

> (a)   an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or
>
> (b)   any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

We conclude that Bonetti's violation of section 1324(a)(1)(B)(iii) ("caus[ing] serious bodily injury . . . to, or plac[ing] in jeopardy the life of any person" during and in relation to a harboring offense) is a "crime of violence" under 18 U.S.C. § 16(b). To satisfy section 16(b), the offense must first be a felony. Bonetti's violation of section 1324(a)(1)(B)(iii) was punishable by up to twenty years in prison; consequently, it was a felony. *See* 18 U.S.C. § 3559(a).

In addition, the felony must, "*by its nature*, involve[ ] a *substantial risk* that physical force against the person or property of another *may* be used in the course of committing the offense." (Emphasis added). The language "by its nature" requires an inquiry into the intrinsic nature of the crime, not into the facts of the offense as it was committed in the particular case. *See United States* v. *Aragon*, 983 F.2d 1306, 1312 (4th Cir. 1993). Hence, whether Bonetti, in the course of committing his crime, actually used physical force against Dos Santos is not relevant to our inquiry. *Id*.

We conclude that commission of the section 1324(a)(1)(B)(iii) offense does entail at least a "substantial risk" that physical force

"may" be used because, in order for section 1324(a)(1)(B)(iii) to be violated, the defendant must either cause serious bodily injury or place in jeopardy a person's life. Although not every violation of section 1324(a)(1)(B)(iii) will in fact entail the use of physical force, as it is possible to cause serious bodily injury or place someone's life in jeopardy without actually using physical force, section 16(b) only requires a *substantial risk* that physical force *may* be used in the course of committing the offense. We believe it self-evident that in every instance of the criminal harboring of an illegal alien that results in serious bodily injury or jeopardy to life there exists at least a "substantial risk" that physical force "may" be used against person or property, if for no other reason than to ensure that the offense remains undetected. Indeed, violations of section 1324(a)(1)(B)(iii) are more likely to entail the use of physical force than other offenses that we have held constitute "crimes of violence" under section 16(b). *See United States* v. *Thompson*, 891 F.2d 507, 509 (4th Cir. 1989) (pointing any loaded or unloaded firearm at a person is a "crime of violence" under section 16(b), because "common sense" dictates that there is a "substantial risk" that physical force may be used during such an offense); *Aragon*, 983 F.2d at 1313 (attempting to instigate or assist in the escape or rescue of a federal prisoner is a "crime of violence" under section 16(b), because of the "potential that, in being played out, physical force will be exerted against some person or some property"). And neither of the offenses at issue in *Thompson* and *Aragon* even required, as an element of the offense, that the defendant cause serious bodily injury to or place in jeopardy the life of a person.

For these reasons, we conclude that Bonetti's violation of section 1324(a)(1)(B)(iii) is a "crime of violence" under section 16(b), and that the Mandatory Victim Restitution Act is therefore applicable to Bonetti's sentencing proceeding.

### B.

Turning to whether Dos Santos is eligible to receive restitution for her lost wages under the MVRA, 18 U.S.C. § 3663A(a)(1) authorizes restitution only to the "victim of the offense, or if the victim is deceased, to the victim's estate." Section 3663(a)(2) defines "victim" as follows:

> For the purposes of this section, the term "victim" means a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern.

There can be no doubt that Dos Santos was "directly and proximately harmed," not only bodily but otherwise, as a result of Bonetti's violation of section 1324(a)(1)(B)(iii), which, as discussed above, is an offense for which restitution may be ordered. The district court's conclusion that Dos Santos was not a "victim" is simply contrary to the plain language of the statute.

The only remaining question is whether the wages Dos Santos lost should be included in the order of restitution. Section 3663A(b) of the MVRA states:

> The order of restitution shall require that such defendant
>
> . . .
>
> > (2)   in the case of *an offense resulting in bodily injury to a victim*
> >
> > . . .
> >
> > > (C)   reimburse the victim for income lost by such victim as a result of *such offense*.

18 U.S.C. § 3663A(b) (emphasis added). First, the government must show that Bonetti's violation of section 1324(a)(1)(B)(iii) actually resulted in bodily injury to Dos Santos, and there is no doubt that it did. As detailed in Section II, Dos Santos suffered physical abuse from Bonetti's wife as well as medical injury, all as a result of Bonetti's criminal conduct.

Second, the government must show that Dos Santos in fact lost income as a result of Bonetti's "offense." The lost income need not be a result of the "bodily injury" required in section 3663A(b)(2). Rather, the government need only show that Bonetti's "offense," which resulted in bodily injury to Dos Santos, also resulted in lost income.

Bonetti's violation of section 1324(a)(1)(B)(iii) not only physically harmed Dos Santos but also deprived her of wages for nearly fourteen years of work. We do not agree with the district court's seeming conclusion that Dos Santos' lost income resulted exclusively from Bonetti's purpose of private financial gain under section 1324(a)(1)(B)(i). While section 1324(a)(1)(B)(i) may be the most specific prohibition on the conduct that resulted in Dos Santos' lost income, that does not mean her loss did not also result from the other violations of the law Bonetti committed in the course of harboring Dos Santos. Rather, each of Bonetti's harboring offenses resulted in Dos Santos being kept in slavery-like conditions without pay for nearly fourteen years.

The district court's denial of restitution to Dos Santos is reversed and the district court is hereby directed to order mandatory restitution.

## *CONCLUSION*

The judgment of the district court is affirmed in part and reversed in part, and the case is remanded with instructions to order Bonetti to pay restitution to Dos Santos for the wages she should have received during the time Bonetti unlawfully harbored her.

*AFFIRMED IN PART AND REVERSED IN PART*